# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DOMINIQUE FLICHER,** | * | **CIVIL ACTION** |
| **CHARLES ALBERT MENDY, and** | * | |
| **CHERYL ANN GERARD MENDY** | * | |
| | * | |
| **Plaintiffs** | * | **CASE NO:** |
| **versus** | * | |
| | * | |
| **BAC HOME LOAN SERVING, LP** | * | |
| **JACKSON & McPHERSON, PLC** | * | **SECTION:** |
| **RADER JACKSON** | * | |
| **DOES 1 THROUGH 10** | * | |
| **ABC INSURANCE COMPANY** | * | |
| **XYZ INSURANCE COMPANY** | * | **MAGISTRATE:** |
| | * | |
| **Defendants** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiffs Dominique Flicher, Charles Albert Mendy, and Cheryl Ann Mendy, who respectfully avers as follows:

## THE PARTIES

1.  Plaintiffs (hereinafter also collectively referred to as "Plaintiffs") herein are:

A.  Dominique Flicher Mendy (hereinafter also referred to "Flicher", a person of the full age of majority, and having her principal place of residence in Orleans Parish, State of Louisiana.

B.  Charles Albert Mendy (hereinafter also referred to "Mendy", a person of the full age of majority, and having his principal place of residence in Orleans Parish, State of Louisiana.

C.  Cheryl Ann Gerard Mendy (hereinafter also referred to "Gerard", a person of the full age of majority, and having his principal place of residence in Orleans Parish, State of

Louisiana.

2.    Made Defendants herein (hereinafter also collectively referred to as "Defendants") herein are the following:

A. Defendant Bank of America, N.A. is a mortgage lender and on belief and information is headquartered in Charlotte, NC. Defendant Bank of America, N.A., on information and belief, is a foreign business corporation licensed to do business and doing business in Orleans Parish, State of Louisiana and this district.

B. Defendant BAC Home Loans Servicing, LP, on information and belief, is a foreign business corporation licensed to do business and doing business in Orleans Parish, State of Louisiana and this district. Defendant BAC Home Loans Servicing, LP, on belief and information is a subsidiary of Bank of America, N.A., and is located in Calabasas, CA. Defendants Bank of America, N.A. and BAC Home Loans Servicing, LP are collectively referred to as "Bank of America" or "BAC" and are currently licensed to do business and doing business in this District, In New Orleans, Louisiana and throughout the state of Louisiana.

C.    ABC INSURANCE COMPANY, on information and belief, a Louisiana or foreign insurance company licensed to do business and doing business in Orleans Parish, State of Louisiana and this district, and contracted to provide insurance coverage to Defendant BAC and its officers, directors, employees, and agents, on information and belief, and at all relevant times provided coverage to cover the damages caused by Defendant BAC in the instant matter, including but not limited to the damages caused by the Defendant BAC and its employees, agents and Attorneys to Plaintiffs and to the property located at 4141 Vendome Place, New Orleans, LA 70125.

D.    Jackson & McPherson, LLP (hereinafter also referred to "Jackson

McPherson"), a Professional Law Partnership organized under the laws of the State of Louisiana, licensed to do business and doing business in the State of Louisiana, and having its principal place of business in Orleans Parish, State of Louisiana and this district.

E.  Rader Jackson (hereinafter also referred to "Jackson", a person of the full age of majority, and having his principal place of residence in Orleans Parish, State of Louisiana.

F. XYZ INSURANCE COMPANY, on information and belief, a Louisiana or foreign insurance company licensed to do business and doing business in Orleans Parish, State of Louisiana, and contracted to provide insurance coverage to Defendants Jackson, Jackson McPherson its officers, directors, employees, and agents, on information and belief, and at all relevant times provided coverage to cover the damages caused by Defendants BAC in the instant matter, including but not limited to the damages caused by the Defendant Jackson and Jackson McPherson to Plaintiffs and to the property located at 4141 Vendome Place, New Orleans, LA 70125.

G. Does 1 through Does 10, on belief and information natural persons or juridical persons that may or may not be residents or citizens of Louisiana currently unknown to Plaintiffs.  Plaintiffs sue them under the fictitious names Does 1 through Does 10 and will amend the petition as the identities of Does 1 through Does 10 are known.

## JURISDICTION & VENUE

3.  This action arises out of Defendants' violations of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211 *et. seq.*; the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* ("FDCPA"), the Making Home Affordable Act ("MHAA") 15 U.S.C. § 1639, the Making Home Affordable Act ("MHAAA") (15 U.S.C. § 1601 *et. seq.*), the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et. seq.*, the invasions of Plaintiffs' personal privacy by these Defendants in their

illegal efforts to collect a consumer debt, and various ancillary state actions and pendent claims including claims for Breach of Contract and violation of Louisiana's Executory Process law.

4.   Jurisdiction of this Court arises under 28 U.S.C. § 1331 (Federal Question Jurisdiction), and pursuant to 28 U.S.C. § 1367 (Supplemental Jurisdiction) for pendent state law claims.

5.   This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP. 12 U.S.C. § 5201 *et seq*.

6.   This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations and other entities that are licensed to do business in the state of Louisiana or otherwise conduct business in the state of Louisiana and the individual Defendants are citizen of the Louisiana.

7.   Venue is proper in this Court as all of the Defendants are domicile in this district, in Orleans Parish, all the parties reside in this District, Defendants transact business here, and the Mortgage Contract, which is the cause of this litigation, was executed in this District.

8.   Additionally, the promissory note, which was issued pursuant to the Mortgage Contract executed by Defendants, and possibly succeeded to by BAC Home Loan Servicing and also a cause of this litigation, was executed in Orleans Parish and this District.

9.   Further, the property that was secured the Mortgage and the Note on the same is sited in Orleans Parish and in this District.

10.   Finally, the acts of breach of contract and the other acts complained of herein, which collectively constitute the cause of this litigation occurred in Orleans Parish and in this District.

11.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiffs reside in this District.

## INTRODUCTION

12.   In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets. By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

13. Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

14.   Bank of America signed a contract with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and included by reference) agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines. The guidelines issued by the Treasury Department set forth

a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

15.   HAMP and its associated directives also set prohibitions against certain conduct *including demanding upfront payments in order to be evaluated for a loan modification*, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

16.   Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply

with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

17. Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America. On information and belief, Bank of America does not own a significant majority of the loans on which it functions as a servicer.

18. Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:[1]

• Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

• The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

• Fees that Bank of America charges borrowers that are in default constitute a significant

---

[1] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

source of revenue to the servicer. Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

• Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

• Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

19. Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

20. In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, that call for Bank of America meeting certain contractual obligation, including federal law and related loan modifications. Plaintiffs and a similar class of borrowers have complied

with the agreements by submitting the documentation asked of them and, when requested, and making payments, in order to even be considered for loan modification. Despite Plaintiffs' efforts, Bank of America has ignored its contractual obligation to modify their loans.

21. Because Bank of America is not meeting its contractual obligations, Plaintiffs and others are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under Louisiana law.

22. Consistent with the TARP mandate, the Treasury Department also implemented the Making Home Affordable Alternatives Program ("MHAAP") – a detailed program also designed to stem the foreclosure crisis by providing alternatives to debtors who do not qualify for affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Companies that accepted money under the TARP are subject to mandatory inclusion in MHAAP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

23.  Bank of America, on belief and information, signed a contract with the U.S. Treasury agreeing to comply with the MHAAP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines. The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

• identify loans that are subject to alternatives under the MHAAP program, both through its own review and in response to requests for MHAAP alternatives from individual homeowners;

• collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for alternatives to loan modification under MHAAP;

• institute an alternative under MHAAP; and

• provide a permanent alternative under MHAAP to those homeowners who comply with the requirements. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for an alternative under MHAAP, whether or not the borrower has been found eligible.

24.   MHAAP and its associated directives also set prohibitions against certain conduct, instituting or continuing foreclosures while a borrower is being evaluated for an alternative under MHAAP, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

25.   Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the MHAAP directives and to extend MHAAP alternatives for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the MHAAP directives and has regularly and repeatedly violated several of its prohibitions.

26.   Under MHAAP, the federal government incentivizes participating servicers to provided MHAAP alternatives to existing mortgage obligations in order to make the MHAAP program workable. However, these incentives are countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid MHAAP

alternatives and to continue to keep a mortgage in a state of default or distress and to push loans

toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party

investor and is merely serviced by the servicer such as Bank of America. On information and

belief, Bank of America does not own a significant majority of the loans on which it functions as

a servicer.

27.   Economic factors that discourage Bank of America from meeting its contractual

obligations under MHAAP by facilitating MHAAP alternative are similar to those that

discourage loan modifications include the following:

• Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.
• The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.
• Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.
• Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.
• Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

28.   Rather than allocating adequate resources and working diligently to reduce the

number of loans in danger of default by establishing MHAAP alternatives, Bank of America has

serially strung out, delayed, and otherwise hindered the MHAAP processes that it contractually

undertook to facilitate when it accepted billions of dollars from the United States. Bank of

America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for MHAAP, and who have met the requirements for participation in the MHAAP program, have not received permanent loan modifications to which they are entitled.

29.   In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, to pursue alternatives to loan modifications and foreclosure. Plaintiffs and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, in order to even be considered for alternatives loan modification. Despite Plaintiffs' efforts, Bank of America has ignored its contractual obligation to pursue alternatives to foreclosure.

30.   Because Bank of America is not meeting its MHAAP contractual obligations, at least hundreds of Louisiana homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the MHAAP contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a MHAAP from Bank of America. Defendants' actions violate their contractual obligations, thwart the purpose of MHAAP, and are illegal under Louisiana law.

31.   Plaintiff Charles Albert Mendy applied for a loan modification under HAMP numerous times.  Each time Bank of America strung him out for months before having his case closed without any reasons to Plaintiff Mendy for the closure of his HAMP application.

32.   Further, rather than pursue his HAMP, application, Bank of America channeled

Plaintiff to pursue a short sale, knowing fully well that it had no intention of honoring same.

33.   Instead, while pretending to be processing Plaintiffs' short sale request and waiting for final approval form the investor, Bank of America proceeded with foreclosing on Plaintiff's house.

34.   Dominique Flicher and Charles Albert Mendy bring this suit on behalf of themselves to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, their failure to honor agreements directly with individual homeowners to pursue alternatives to HAMP under the MHAAP, and to recover for the illegal foreclosure of their house as well as other damages caused by BAC, their employees and attorneys.

## FACTUAL BACKGROUND

### A.  The Foreclosure Crisis

35.   Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

36.   Louisiana has been no exception. The number of Louisiana properties with foreclosure filings in 2008 was higher than in 2007 and higher than in 2006 – more than double the number of filings in the span of two years.[3]

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at
http://cop.senate.gov/reports/library/report100909-cop.cfin.
[3] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent in 2008* (Jan. 15, 2009). Available at
http://www.realtytrac.com/contentmanagement/pressrelease.aspx ?channelid=9&accnt=0&itemid=5 681.

37.   According to 2009 data, the numbers continue to rise. In the third quarter of 2009, foreclosures filed on Louisiana properties increased over the same period of 2008.[4]  Overall in 2009, more individual properties in Louisiana had foreclosure filings against them, higher than both 2008 and 2007 levels and an increase of more than 100% over 2004.[5]

38.   Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

### B.    Creation of the Home Affordable Modification Program

39.    Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A § 5201 *et seq.* (2009).

40.    The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." *Id*.

41.    The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id*.

---

[4] RealtyTrac Staff, *U.S. Foreclosure Activity Increases 5 Percent in Q3* (Oct. 15, 2009). Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx? channelid=9&accnt=0&itemid=77 06.

[5] RealtyTrac Staff, *RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009* (Jan. 14, 2010). Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333

42.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

43.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

44.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id*.

45.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

46.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

47.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP .

48.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

49.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C.     Duties of a Participating Servicer Under HAMP**

50.     Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer." On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government.

51.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." SPA I.A., 2.A.[6]

52.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." SD 09-01at p. 1. This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP

---

[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01,"), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview") and Supplemental Documentation-Frequently Asked Questions ("HAMPF AQS") and Supplemental Directive 09-08 ("SD 09-08"). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

"to provide a borrower with sustainable monthly payments." *Id*.

53.     The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. SD 09-01 p. 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. *Id*. at pp. 3-4.

54.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[7]

55.     A Mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met. Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

56.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions." SD 9-01 at p. 13.

---

[7] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

57.     Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* SD 09-01 pp. 8-10; *see also* Ex. 3 at p. 2.

58. After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the borrower a TPP. The TPP consists of a three-month period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. Bank of America uses a standard form agreement to offer TPPs to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

59.  If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP. Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared. Once capped, the rate is fixed for the remainder of the term. *See* SD 09-01 p. 9.

60. HAMP prohibits a participating servicer from taking several actions including the following:

    a.  Proceeding with a foreclosure sale. Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options. *See* Ex. 4 at Q63; *see also* SD 09-01 (Ex. 2) at p. 14.

    b.  Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts. Ex. 4 at Q. 83.

    c. Soliciting borrowers to opt out of consideration for HAMP during the temporary review period. Ex. 8 at Q1230-02.

    d.  Reporting borrowers as delinquent to credit reporting bureaus without explanation. For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period. For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status. SD 09-01 (Ex. 2) at p. 22.

    e.  Assessing prepayment penalties for full or partial prepayment as part of the modification. Ex. 4 at Q. 25.

61. borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. SD 09-08 (Ex. 5) at p. 1.

62.    The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter. HAMP Supplemental Documentation dated December

22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification. If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

Ex. 8 at Q1222-01.

63.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices. SPA, Ex. 1 at ¶ 5(b).

64.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services. *Id*. at ¶ 5(d).

65.     Bank of America has routinely failed to meet its obligations under the Program Directive. Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information. Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.

Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

66.    Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners. In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio. Trial periods have been started on only 237,766 of these loans. Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.

67.    By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

**D.    Plaintiffs' Effort to Obtain a Loan Modification Under HAMP**

68.    Plaintiffs Dominique Flicher and Charles Albert Mendy purchased their home in 2004. They financed their mortgage with America's Home Mortgage.

69.    The mortgage, on belief and information, was transferred to Countrywide and then to BAC.

70.    Required monthly principal and interest payments of $2,401 initially.

71.    Mr. and Mrs. Mendy made the regularly scheduled payments on their loan for several years and remained current until 2006. Plaintiffs own and operate a small, independent construction and design business. In 2006, as a result of the economic downturn and Hurricane

Katrina, their income had dropped to less than $20,000 per year and they were having difficulty paying their monthly mortgage payments. Plaintiffs contacted Bank of America to inform them of their difficulty and to inquire as to a possible workout arrangement. Bank of America informed them that it would not consider any workout arrangement or other forbearance agreement unless and until they were delinquent on their mortgage and advised Plaintiffs to become delinquent on their mortgage.

72.     Mr. and Mrs. Mendy followed Bank of America's advice and fell behind on their mortgage payments in approximately Fall 2006. In early 2007, the Mendy began an effort to obtain a loan modification through Defendant Bank of America.

73.     Over several months, Mr. and Mrs. Mendy submitted financial information and applications to Bank of America in an effort to obtain a modification or forbearance agreement. Though they provided all information that Bank of America asked of them, their efforts were unsuccessful.

74.     In or about June 2009, Mr. and Mrs. Mendy heard about the possibility of obtaining a loan modification through the HAMP program.  Plaintiffs sent a letter to Bank of America requesting to be considered for a loan modification through the HAMP program. Plaintiffs followed up with telephone calls numerous time. Bank of America claimed not to have received the letter. Plaintiffs requested and received instructions as to the information and documents Bank of America required to consider Plaintiffs for a loan modification under HAMP.

75.     Over the next several months, Plaintiffs sent all information requested of them to Bank of America via fax and mail. The documents Plaintiffs faxed included a signed HAMP Hardship letter on a form provided by Bank of America, bank statements, tax returns, and statements showing their property tax account and homeowner's insurance policy. Bank of

America acknowledged receipt of Plaintiffs' documents needed *in order to be considered for a HAMP loan modification*.

76.     Despite receiving all of the documents needed for a HAMP modification, Bank of America never acted on Plaintiffs' request and never gave Plaintiffs a reason why their HAMP loan modification request could not be approved.

77.     Instead, Bank of America representatives would condition a HAMP on Plaintiffs paying $25,000.00 or more as part of the terms of the HAMP modification that Bank of America would offer. The representative stated that BAC would send out the offer letter but that Plaintiffs would need to agree to the large payment before getting a HAMP modification.

78.   Plaintiffs made numerous other attempts to modify their loans.

79.   Despite Plaintiffs best efforts, not loan modification was forthcoming.

80.   Neither was any reason for failure to modify.

81.    BAC representative advised Plaintiffs that after looking at their documents and request for a loan modification, the best thing for them was to pursue a short sale under MHAAP.

82.   Keen to save their house, Plaintiffs agreed to undertake a short sale.

83.    Out of an abundance of caution, Plaintiffs did not abandon their request for loan modification informing BAC that they were willing to consider whichever came in first.

84.   Plaintiffs, against sent all the documents needed for a short sale and/or requested by BAC.

85.   BAC, however, never finalized a short sale.

86.    At various times, BAC would represent that the short sale proposed was approved but that final approval was needed from the investor.

87.     As of this date, Plaintiffs still had not received the final documents they were told to expect. After several inquiries, including requests that they re-send a copy of the Terms and Conditions Agreement because part of it had been "lost," Plaintiff learnt that Bank of America has resume foreclosure of their property.

88.  Despite promising not to foreclosure on the their property until final approval has been received and/or the investor has refused to give final approval, BAC resumed foreclosure of the Property and had same set for sale for July 1, 2010.

89.     Despite their compliance with the Terms and Conditions Agreement, and all their responsibilities under the terms of the HAMP program directives, Mr. and Mrs. Mendy have not been provided a Loan Modification Agreement under the HAMP Program guidelines to date.

90.     Like hundreds or even thousands of Louisiana residents, Mr. and Mrs. Mendy was forced to live in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements. They have invested their limited resources in renovating the Property based on the promise that doing so would result in a loan modification or short sale.

91.     Despite their compliance with the Terms and Conditions Agreement, and all their responsibilities under the terms of the HAMP program directives, Mr. and Mrs. Mendy have not been provided a short sale, short sale or other alternative Agreement under the MHAAP Program guidelines to date.

92.     Like hundreds or even thousands of Louisiana residents, Mr. and Mrs. Mendy have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with MHAAP requirements and their continued provision of documentation to Bank of America. They have invested their limited resources in pursing a short sale and other

MHAAP based on the promise that doing so would result in a short sale or other MHAAP alternative.

93.  Further, Plaintiffs abandoned a defense of the executory process action in reliance on BAC's promises.

94.  Despite its promises, BAC proceeded with the executory process and sold Plaintiffs' property at a Sheriff's Sale for $425,000.00.

## EXECUTORY PROCESS ALLEGATIONS

95.  On or about July 16, 2009, plaintiff BAC HOME LOAN SERVICING, LP, through its attorney Rader Jackson, filed a Petition for Executory Process (Petition for Executory Process) against Executory Process Defendants Dominique Flicher and Charles Albert Mendy in this matter.

96.  Concurrently with the filing of the Petition for Executory Process, BAC, through its attorney Rader Jackson, also filed a Writ of Seizure and Sale against Executory Process Defendants in this matter, which writ was issued on or about July 16, 2009 the same date as the filing of the Petition for Executory Process.

97.  Accompanying the Petition for Executory Process, BAC had its attorneys, Jackson McPherson, prepare and file with the Petition for Executory Process an Affidavit attesting that the allegations of fact contained in the Petition for Executory Process are "true and correct" to the best of Affiant's knowledge, information and belief.

98.  Pursuant to the Petition for Executory Process, and the attestation in the Affidavit, the court issued an Order on or about July 16, 2009 granting Petitioner's request for Executory Process.

99.  Accordingly, a Writ of Seizure and Sale was issued and entered.

100.  On or about July 1, 2010, BAC caused the Property to be sold at a Public Sale for $425,000.00.

101.  BAC, as seizing creditor, was the highest bidder.

## COUNT I
## BREACH OF CONTRACT UNDER HAMP AND MHAAP
### (Against BAC)

102.  Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

103.  Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

104.  The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs.

105.  By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

106.  Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

107.  In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

108.  The short sale proposal Bank of America to Plaintiffs constitutes a valid offer.

109.  By agreeing to the short sale Agreement with Bank of America, and providing the supporting documentation, Plaintiffs accepted Bank of America's offer.

110.    Alternatively, Plaintiffs' return of the Agreement constitutes an offer. Acceptance of this offer occurred when Bank of America accepted Plaintiffs' offer.

111.    Plaintiffs' agreement not to aggressively fight Bank of America by forcing discovery in BAC's foreclosure lawsuit constitute consideration. By these arrangement, Plaintiffs gave up the ability to pursue other means of saving their home.

112.    Plaintiffs and Bank of America thereby formed valid contracts.

113.    To the extent that the contracts were subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when they returned the documents, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiffs' claims.

114.    By failing to offer Plaintiffs a HAMP modification and/or do the short sale, Bank of America breached those contracts.  BAC further breached these contracts by selling Plaintiffs Property via executory process while pretending to be waiting for final approval of the short sale and reviewing Plaintiffs' HAMP request.

115.    Bank of America routinely and regularly breach its duties under both the SPA and their contract with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; by deliberately acting to delay and otherwise frustrate short sale and other MHAAP processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; making inaccurate calculations and determinations of Plaintiffs' eligibility for short sale and other MHAAP alternatives and failing to follow through on written and implied promises.

116.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to meet BAC requirement and provide documentation.

117.    Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach. By acceding to BAC demands and requirement, spending money on renovating the Property, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. Plaintiffs have suffered additional harm in the form of foreclosure activity against their home.

## COUNT II
## VIOLATION OF MAKING HOME AFFORDABLE PROGRAM
### (Against BAC)

118.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

119.  In February 2009, the Obama Administration introduced a comprehensive Financial Stability Plan to address the key problems at the heart of the current crisis to get our economy back on track. A critical piece of that effort is Making Home Affordable, a plan to stabilize the housing market and help struggling homeowners get relief and avoid foreclosure. http://www.makinghomeaffordable.gov.

120.  The **Home Affordable Modification Program** provides eligible homeowners the opportunity to modify their mortgages to make them more affordable. Over one million homeowners have already gotten help under the program.  The HAMP program is on track to help three to four million homeowners by 2012.  http://www.makinghomeaffordable.gov.

121.  The **Home Affordable Modification Program**, also known as HAMP, is a federal program of the United States, set up to help eligible home owners with loan modifications on their home mortgage debt. It is being set up in the context of the ongoing subprime mortgage

crisis in the debt markets, continuing from 2008.  The target of the HAMP program is seven to eight million struggling homeowners at risk of foreclosure by working with their lenders to lower monthly mortgage payments.   http://www.makinghomeaffordable.gov.   The Program is part of the Making Home Affordable Program, which was created by the Financial Stability Act of 2009.  http://www.financialstability.gov.

122.   The program was built as collaboration with banks, services, credit unions, the FHA, the VA, the USDA and the Federal Housing Finance Agency, to create standard loan modification guidelines for lenders to take into consideration when evaluating a borrower for a potential loan modification. Over 110 major lenders have already signed onto the program. The Program is now looked upon as the industry standard practice for lenders to analyze potential modification applicants.  http://www.makinghomeaffordable.gov.

123.  The program abides by the following eligibility and verification criteria:

- Loans originated on or before January 1, 2009
- First-lien loans on owner-occupied properties with unpaid principal balance up to $729,750
- Higher limits allowed for owner-occupied properties with 2-4 units
- All servicers for loans owned or guaranteed by Fannie Mae and Freddie Mac are required to participate. Additional servicers are strongly encouraged to participate. http://www.cmcsoa.org.  Bank of America received billions of dollars and was one of the signatories and participants.
- The current principal, interest, property taxes and homeowner's insurance payments are costing the borrower(s) over 31% of their gross monthly household income.
- All borrowers must fully document income, including signed IRS 4506-T, proof of income (i.e. paystubs or tax returns), and must sign an affidavit of financial hardship
- Property owner occupancy status will be verified through borrower credit report and other documentation; no investor-owned, vacant, or condemned properties
- Incentives to lenders and servicers to modify at risk borrowers who have not yet missed payments when the servicer determines that the borrower is at imminent risk of default
- Modifications can start from now until December 31, 2012; loans can be modified only once under the program.  http://www.hmpadmin.com.

124.    Further, the program abides by the following Loan modification terms and procedures:

- Participating servicers are required to service all eligible loans under the rules of the program unless explicitly prohibited by contract; servicers are required to use reasonable efforts to obtain waivers of limits on participation.
- Participating loan servicers will be required to use a net present value (NPV) test on each loan that is at risk of imminent default or at least 60 days delinquent. The NPV test will compare the net present value of cash flows with modification and without modification. If the test is positive: meaning that the net present value of expected cash flow is greater in the modification scenario: the servicer must modify absent fraud or a contract prohibition.
- Parameters of the NPV test are spelled out in the guidelines, including acceptable discount rates, property valuation methodologies, home price appreciation assumptions, foreclosure costs and timelines, and borrower cure and redefault rate assumptions.
- Servicers will follow a specified sequence of steps in order to reduce the monthly payment to no more than 31% of gross monthly income (DTI).
- The modification sequence requires first reducing the interest rate (subject to a rate floor of 2%), then if necessary extending the term or amortization of the loan up to a maximum of 40 years, and then if necessary forbearing principal. Principal forgiveness or a Hope for Homeowners refinancing are acceptable alternatives.
- The monthly payment includes principal, interest, taxes, insurance, flood insurance, homeowner's association and/or condominium fees. Monthly income includes wages, salary, overtime, fees, commissions, tips, social security, pensions, and all other income.
- Servicers must enter into the program agreements with Treasury's financial agent on or before December 31, 2009. http://www.hmpadmin.com; http://www.makinghomeaffordable.gov.

125.    Finally the Making Home Affordable program abides by the following terms and conditions for Payments to servicers, lenders, and responsible borrowers:

- The Program will share with the lender/investor the cost of reductions in monthly payments from 38% DTI to 31% DTI.
- Servicers that modify loans according to the guidelines will receive an up-front fee of $1,000 for each modification, plus "pay for success" fees on still-performing loans of $1,000 per year.
- Homeowners who make their payments on time are eligible for up to $1,000 of principal reduction payments each year for up to five years.
- The program will provide one-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers for modifications made while a borrower is still current on mortgage payments.

- The program will include incentives for extinguishing second liens on loans modified under this program.
- No payments will be made under the program to the lender/investor, servicer, or borrower unless and until the servicer has first entered into the program agreements with Treasury's financial agent.
- Similar incentives will be paid for Hope for Homeowner refinances.

  http://www.ustreas.gov;  http://www.makinghomeaffordable.gov.

126.   Flicher and Mendy met all the requirement of Home Affordable Program.   The home in question is their primary residence.   The amount owe on the first mortgage equal to or less than $729,750. Flicher and Mendy were having trouble paying their mortgage.   They *had a significant increase in their mortgage payment from $2400.00 to over $3,000 as well as a reduction in your income since they obtained the current loan.   Further they have had to deal with the hardship of losing most of their properties through Hurricane Katrina.   The* payment on their first mortgage (including principal, interest, taxes, insurance and homeowner's association dues, if applicable) more than 31% of their current gross income?

127.   Despite all this and their efforts for a loan modification, Flicher and Mendy were never offered a trial loan modification or a permanent loan modification as required by the Making Home Affordable Program.

128.   BAC's failure to comply with the terms of the Making Home Affordable Program has caused Plaintiffs harm and resulted damages for which Defendants are responsible.

## COUNT III
## VIOLATION OF MAKING HOME AFFORDABLE ALTERNATIVES PROGRAM
### (Against BAC)

129.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

130.  The **Home Affordable Foreclosure Alternatives Program** provides opportunities for homeowners who can no longer afford to stay in their home but want to avoid foreclosure to transition to more affordable housing through a short sale or deed-in-lieu of foreclosure.

131.  Many homeowners may feel that they can no longer afford their home, but want to avoid the negative effects of foreclosure. The Home Affordable Foreclosure Alternatives (HAFA) Program offers homeowners, their mortgage servicers, and investors an incentive for completing a short sale or deed-in-lieu of foreclosure. With these options, under HAFA, a homeowner leaves their home to transition to more affordable housing and alleviate the mortgage debt they owe.

132.  These options are available for homeowners who meet the following conditions and/or requirements:

a) do not qualify for a trial mortgage modification under the Making Home Affordable Program;

b) do not successfully complete the trial period for their modification;

c) miss at least two consecutive payments during their modification period; or

d). request a short sale or deed-in-lieu of foreclosure.

**Short Sale**

133.  In a short sale, the servicer allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage.

**Deed-in-Lieu of Foreclosure**

134.  Generally, if the borrower makes a good faith effort to sell the property but is not successful, a servicer may consider a deed-in-lieu of foreclosure. With a deed-in-lieu, the

borrower voluntarily transfers ownership of the property to the servicer— provided the title is free and clear of mortgages, liens, and encumbrances.

135.   The MHAAP Program streamlines both of these options to make them easier for a homeowner to work with their servicer. Under the program, a homeowner can receive $3,000 to help with relocation costs.

136.   Mortgage servicers and investors write their own guidelines under the Federal requirements to determine how to implement the program.

137.   Flicher and Mendy explored each of the above with Countrywide and Bank of America, all to no avail.  Not only did they not timely respond to defendants' requests, they have not responded at all or give the Defendants any reason for refusing to accept any of the options explored.

138.   BAC's failure to comply with the terms of the Making Home Affordable Alternatives Program has caused Plaintiffs harm and resulted damages for which Defendants are responsible.

## COUNT IV
## HAMP PROMISSORY ESTOPPEL, IN THE ALTERNATIVE
### (Against BAC)

139.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

140.   Bank of America, by way of its Agreements, made a representation to Plaintiffs that if they would receive a HAMP modification.

141.   Bank of America's Agreement was intended to induce Plaintiffs to rely on it and comply with same.

142.   Plaintiffs did indeed rely on Bank of America's representation.

143.   Plaintiffs' reliance was reasonable.

144.   Plaintiffs' reliance was to their detriment. Plaintiffs were never a permanent HAMP loan modification and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

145.   Bank of America is liable to Plaintiffs members for damages in an amount to be determined at trial, including attorneys' fees, costs and statutory damages, and should be enjoined from being able to foreclose on Plaintiffs' house.

### COUNT V
### MHAAP PROMISSORY ESTOPPEL, IN THE ALTERNATIVE
### (Against BAC)

146.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

147.   Bank of America, by way of its Agreements, made a representation to Plaintiffs that if they returned supporting documentation, they would receive a short sale or other MHAAP modification.

148.   Bank of America's Agreement was intended to induce Plaintiffs to rely on it and to lull Plaintiff into a false sense of security.

149.   Plaintiffs did indeed rely on Bank of America's representation.

150.   Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

151.   Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive the short sale or any other MHAAP alternative and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

152.   Bank of America is liable to Plaintiffs members for damages in an amount to be determined at trial, including attorneys' fees, costs and statutory damages, and should be enjoined from being able to foreclose on Plaintiffs' house.

**COUNT VI**
**FAIR DEBT COLLECTION PRACTICES ACT**
**(Against Jackson McPherson, Jackson and Does 1 through Does 10)**

153.   The allegation of paragraphs 1 through 152 are incorporated herein by reference and repleaded herein.

154.   Plaintiffs, Dominique Flicher and Charles Albert Mendy, and each of them, is natural persons and a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

155.   Defendant Jackson McPherson is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

156.   Defendant Rader Jackson is a natural person employed by Defendant Jackson McPherson as a collection agent and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

157.   In 2004, Plaintiffs Flicher and Mendy incurred a financial obligation that was primarily for personal, family or household purposes and is therefore a "debt" as that term is defined by 15 U.S.C. § 1692a(5), namely, a loan in the approximate amount of $290,000.00, which was used to make pay off the mortgage on Plaintiffs property located at 4141 Vendome Place, New Orleans Louisiana (the Property).

158.   Sometime after, the alleged debt was placed into Jackson McPherson and Jackson's hands by Defendant BAC for collection from Plaintiffs.

159.   Starting in July 2009 and continuing to the present, including the filing of BAC's foreclosure action in the Civil District Court for the Parish of Orleans, Defendants Jackson McPherson and Jackson contacted Plaintiffs, in an attempt to collect the debts from Plaintiffs, all of which attempts, and each of them, was a communication in an attempt to collect a debt as that term is defined by 15 U.S.C. § 1692a(2).

160.   When asked for proof of the debt, time and time again Jackson McPherson and Jackson refused to provide any documentation of the debt.

161.   The conduct of Defendants Jackson McPherson and Jackson in harassing Plaintiffs in an effort to collect the debts by repeatedly sending Plaintiffs threatening letters was a violation of numerous and multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692d, 1692e, 1692e(5), 1692e(7), 1692e(10), and 1692f, amongst others.

162.   Plaintiffs have suffered actual damages as a result of these illegal collection communications in the form of humiliation, anger, anxiety, emotional distress, fear, frustration, embarrassment, amongst other negative emotions, as well as suffering from unjustified and abusive invasions of personal privacy at the Plaintiffs' home and workplace.

163.   The foregoing acts and omissions of each and every Defendant constitute numerous and multiple violations of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq.

164.   As a result of each and every Defendant's violations of the FDCPA, Plaintiffs are therefore entitled to actual damages pursuant to 15 U.S.C. § 1692k(a)(1); statutory damages in an amount up to $1,000.00 for each violation pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3) from Jackson McPherson and Jackson, as well as from each and every Defendant involved herein.

### COUNT VII
### <u>VIOLATION OF FEDERAL UNFAIR TRADE PRACTICES</u>
#### (Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)

165.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

166.   The conduct of Bank of America, its attorneys and agents as set forth herein constitutes unfair or deceptive acts or practices, including its practice of leading borrowers to

believe that it will modify their mortgage loans, offer them short sales and/or other MHAAP relief.

167.    Bank of America's conduct as set forth herein occurred in the course of trade or commerce.

168.    Bank of America's conduct as set forth herein affects the public interest because it was part of a generalized course of conduct affecting numerous customers.

169.    Bank of America's conduct as set forth herein is a violation of federal unfair trade practices legislation in both Title 12 and Title 15 of the United State Code.

170.    Bank of America's conduct as set forth herein proximately caused injury in fact to Plaintiff and property of Plaintiffs.

171.    Bank of America, its attorneys and agents are liable to Plaintiffs for damages in an amount to be determined at trial, including attorneys' fees, costs and statutory damages, and should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable and unlawful practices as alleged herein.

## COUNT VIII
## VIOLATION OF THE GRAMM-LEACH-BLILEY ACT
### (Against all Defendants)

172.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

173.  By their actions alleged herein, the Defendants, either directly or through aiding and abetting, violated the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et. seq.*

174.   As a direct and proximate result of the Defendants' violation of Gramm-Leach-Bliley alleged herein, Plaintiffs have sustained and will continue to sustain significant damages in a sum currently unascertainable.

175.  As a result of the misconduct and breaches of Gramm-Leach-Bliley alleged herein, the Defendants are liable to Plaintiffs.

176. Neither the whole nor part of this sum has been paid, although demand therefore has been made before the filing of this Complaint and by this Complaint.

177.  Consequently, there is now due and owing, and unpaid, a sum in an amount not yet ascertained, with interest judicial interest thereon as set by law.

**COUNT IX**
**ABUSE OF EXECUTORY PROCESS**
**(Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)**

178.  The allegation of paragraphs 1 through 101 are incorporated herein by reference and repleaded herein.

179.  The actions of BAC HOME LOAN SERVICING, LP herein constitute an abuse of executory process in violation of Article 2315 of the Louisiana Civil Code.

180.  The proceedings instituted by BAC HOME LOAN SERVICING, LP as well as the related the sale of the property via executory process was instituted for improper purposes, namely the improper sale and acquisition of Plaintiffs' property.

181. The executory process and the execution of same were rife with irregularities and constitute an abuse of process by Defendant BAC.

182.  Executory Process is an accelerated procedure of a summary nature by which the lender uses a mortgage that includes an "authentic act that imparts a confession of judgment."

183.  The Creditor initiates Executory Process by filing a Petition that is supported by the required authentic evidence in a court or competent jurisdiction and proper venue.  LA C.C.P Art. 2634.

184.   The court can then enter an order for the issuance of Executory Process once the necessary evidence is filed with the Clerk and the Court reviews the sufficiency of the evidence presented to determine whether it warrants the issuance of a Writ of Seizure and Sale. LA C.C.P Art. 2638.

185.   Once Executory Process issues, the borrower is served with a demand for payments that are due and unpaid on the loan.  LA C.C.P Art. 2721.  This notice is mandatory and cannot be waived.

186.   The borrower has three days to come up with the money. If the borrower does not pay, the court will issue a Writ of Seizure and Sale, armed with which, the sheriff will seize the real estate. The borrower gets a notice of seizure. The property is then advertised once a week for 30 days. The sheriff will then sell the property at auction to pay down or pay off the loan.

187.   The Executory Process type of foreclosure process moves more quickly and easily, and the ideal timeline is compressed, in most cases approximately six months.

Executory Process is harsh and exacting. Executory Process allows a lender to seize possession of the property prior to reselling it at a foreclosure sale.

188.   Consequently, the lender must meet all the requirement of law in order to be allowed to sell a borrower's property at a foreclosure sale.

189.   BAC did not meet the requirements of Executory Process.

190.   BAC did not meet the mortgage requirements that it was a holder in due course an "authentic act that imparts a confession of judgment."

191.   Defendants did not contract with Bank of America Home Loan Servicing, LP.    In order to foreclose on Defendants, Plaintiff has to establish a clear chain of title.

192.  Under La. R.S. 9:4422(2) when there is a foreclosure by executory process, "[t]he assignment, pledge, negotiation, or other transfer of any obligation secured by a mortgage or privilege may be proven by any form of private writing, and such writing shall be deemed authentic for the purposes of executory process."

193.  In this matter, there was no legal assignment of the mortgage note or a corporate resolution giving authority to anyone to transfer the mortgage note. The foreclosure record does not contain a copy of the "Assignment of Note and Mortgage" or anything that states "Pay to the Order of BAC Home Loan Servicing, LP.

194.  According to La. R.S. 9:4422(2), the assignment must be proven by any writing.  In this case, there is no proof of "the assignment"  that is authentic for the purpose of the executory process. Therefore, this should find a procedural error by Plaintiff in petitioning for executory process as no authentic assignment was attached to the petition.

195.  In addition to not establishing standing that it had the right to initiate foreclosure, BAC did not meet the other requirements for executory process.

196.  While a lender is not required by state law to send any notification to the borrower before beginning the foreclosure process, the agreements between the Lender and the borrower may command such notice.

197. In the instant matter, the promissory note which evidenced the obligation of the Defendants and movers herein requires that notice of default be given via first class mail to the Property address as provided in the Promissory Note (particularly Section 7 of Promissory Note).

198.  Further the applicable Mortgage also requires that notice of default be given via first class mail to the Property Address (Sections 15 and 22 of the Mortgage).

199.  Even if the agreement between the Lender and the Borrowers did not include any such notice requirements, Lender still had an obligation to properly notice defendant in order to perfect its Executory Process proceedings.  La. C.C.P. art 2721.

200. Whether or not the agreement between BAC and Plaintiffs provided for notice, Defendants as the borrowers must be served with a demand for the default amount.  The default amount must be specific and attested to by the Lender in affidavit form.

201.  In this case while attempt was made to state the amount of the loan, no such specific amount of the default or accounting of default was given in the instant.  All we have herein is a generic affidavit stating that the loan was in default and that the allegations in the Petition were true.

203.  Once notice of the default amount is given, the borrower has three days pay the amount, reinstate the loan or face foreclosure.  La. C.C.P. art 2638.

204.  If the borrower does not provide the amount within three days, the court orders a Writ of Seizure and Sale, and the clerk delivers it to the sheriff.  *Id.*

205.  In the instant, not only was notice of the specific amount owed or the amount not given to borrowers, the requisite three days before delivery to the sheriff was not even given. The property was immediately delivered to Sheriff and the Writ of Seizure and Sale issued immediately.

206.  Consequently, the Writ of Seizure and Sale issued in the instant was wrongly issued.

207.  Once a Petition for Executory Process is filed and the Writ of Seizure and Sale is issued, the borrower must be personally served with the notice of foreclosure sale by the sheriff. LA C.C.P Art. 2721(B).

208.  In the instant at least one of the borrowers, Dominique Flicher Mendy, was not personally served with the notice, and the service on the other, Charles Albert Mendy is questionable.

209.  Domiciliary Service was never made on Charles Mendy by delivering the papers to the Property Address as required by not the Note and the Mortgage which is the cause of this litigation.

210.  The Executory Process Petitioner in this matter did not have the right to Executory Process as it had not complied with the requirements for Executory Process.

211.  Proper notice of default was not made on Borrower before the commencement of Executory Process as required by the Note.

212.  Proper notice of default was not made on Borrower before the commencement of Executory Process as required by the Mortgage.

213.  The lender did not use a mortgage that includes an "authentic act that imparts a confession of judgment" in which the borrower accepts the obligations under the mortgage.

214.  Even if the lender was not required by state law to send any notification to the borrower before beginning the foreclosure process, BAC, as the Lender herein, was required to send notice before beginning the foreclosure process because the Note and Mortgage included such a requirement.

215.  Once the Petition was filed, the borrower was required to be served with a demand for the default amount. The Borrowers were never served with any such demand.

216.  The borrower must be given three days to provide the amount that is in default before the court can issue a Writ of Seizure and Sale.  The borrowers herein were not given any such notice or time before the issuance of the Writ of Seizure and Sale.

217.  While BAC can argue that it was not required by state law to send any notification to the borrower before beginning the foreclosure process, the agreements between it as lender and Charles Albert Mendy as borrower commanded such notice.

218.  In the instant not only was notice not given, the mandatory three days before the clerk delivers the Writ of Seizure and Sale to the Sheriff was not even allowed to the Borrowers.

219.  In the instant matter, the Writ of Seizure and Sale was issued contemporaneously with the Petition of Executory Process and delivered to the Sheriff in only one (1) day, not three days as required by law.

220.  Consequently the whole Executory Process in the instant was flawed and the sale of the property in the instant was improper.

221.  Executory Process is harsh and exacting.

222.  BAC should not have used it lightly.

223.  BAC certainly should not have used it without all the requirements being met.

224.  BAC and/or its attorneys woefully failed to met the requirements of Executory Process.

225. BAC and its attorneys knew or should have known that Executory Process would allow it as a lender to seize possession of the property prior to reselling it at a foreclosure sale and that any impropriety would give it an unfair advantage.

226. BAC and its attorneys knew or should have known that it should have met all the formal and procedural requirements of Executory Process before they had the Property sold by the Civil Sheriff pursuant to its Executory Process proceeding.

227.  As outlined hereinabove, however, BAC and its attorneys woefully failed to met the requirements of Executory Process and sold the property without meeting all the requirements of

the Law.

## COUNT X
## BAD FAITH
**(Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)**

229.  BAC HOME LOAN SERVICING, LP and its attorneys acted in bad faith through out this proceedings and in its dealing with Plaintiffs.

230.  Defendants' bad faith is evidenced by BAC bidding $425,000.00 for the Property, more than the $291,000.00 writ amount and the $387,000.00 updated amount owed.

231.  Further, before even taking title to the property, Defendants immediately started sending letters to Plaintiffs claiming that they have taken title to the property and starting harassing Plaintiff to leave the Property.

232.  Specifically, on or about July 3, 2010 and July 3, 2010, BAC sent correspondence noticing the sale and demanding that Plaintiffs vacate the promises.

233.  Further, BAC sent a realtor to go inspect the property and have same listed for sale.

234.  BAC and its attorneys did this knowing fully well that there was a 90-day eviction moratorium in Orleans Parish.

235.  Plaintiffs have spent the better part of two years contacting BAC in order to seek amicable resolution of their delinquency.

236.  Despite numerous attempts, no resolution was forthcoming.

237.  All efforts were to no fruition.

238.  While professing to want to resolve the matter amicably, Plaintiff BAC HOME LOAN SERVICING, LP proceeded with the sale of Plaintiffs' home.

239.  Prior to the sale of the property, Charles Albert Mendy contacted BAC in efforts at amicable resolution.   Charles Albert Mendy proceeded to contact the BAC to work out an

agreement with BAC.

240.   Charles Albert Mendy had offered to purchase the property on a short basis and/or otherwise agree on a process for making the loan current. The bank represented that either would be acceptable to it. However, for one reason or another, and through no fault of Dominique Flicher Mendy and Charles Albert Mendy, a short sale or other agreement was never finalized.

241.   Then, without any notice to Defendants Dominique Flicher Mendy and Charles Albert Mendy, BAC proceeded to sell the property via a Sheriff's Public Sale.

242.   On information and belief, BAC had no interest (and never had any) at amicable resolution.   Rather, the guise of amicable resolution was being used only to lull Mendy and Flicher, to have Charles Albert Mendy, Dominique Flicher Mendy, and their attorney put their guards down, while Plaintiff BAC HOME LOAN SERVICING, LP proceeded with an improper foreclosure of the Property.

243.   Witness the fact that BAC started asserting ownership rights over the property and immediately sent out notices to vacate to the inhabitants of the property even before the ink on the sale dried.

244.   Despite repeated attempts by Mendy and Flicher, BAC HOME LOAN SERVICING, LP made no good faith effort at amicable resolution.

245.   Further, BAC did not make any effort to stall or reverse the sale.

246.   BAC did not made any good effort to act on the short sale offer made by Mendy and Flicher, and/or the Defendant's representatives.

247.   The abuse of process herein by BAC HOME LOAN SERVICING, LP has caused damages to Plaintiffs Mendy, Flicher and Gerard.

248. Charles Albert Mendy, Dominique Flicher Mendy and Cheryl Ann Mendy have

suffered damages, in an amount not yet ascertained and to be established at trial, and caused Defendant BAC HOME LOAN SERVICING, LP and its employees, attorney and agents for their actions in this matter as well the cost of this litigation.

249. Plaintiffs are entitled to reasonable Attorney's fees and court cost as a result of Defendants abuse of executory process, improper appointment of a curator and other abuse of process as will be shown at trial.

**COUNT XI**
**<u>VIOLATION OF ARTICLE 863</u>**
**(Against Jackson McPherson, Jackson and Does 1 through Does 10)**

250.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

251.  Counterclaim Defendant BAC HOME LOAN SERVICING, LP and its attorneys, are in violation of Article 863 of the Louisiana Civil Code.

252. Article 863 of the Louisiana Civil Code provides that the signature of an attorney or party on a pleading constitutes a certification that said pleading "is well grounded in fact . . . and that it is not interposed for any improper purpose. La. Code Civ. P. Art. 863(B).

253.  The whole executory process filed and implemented by BAC and its attorneys is a violation of Article 863.

254.  The executory process in this matter, as pleaded hereinabove and will further be proven at trial, was not well grounded in fact.

255.  The executory process was interposed for the sole and improper reason of depriving Plaintiffs of their property rights in the property located at 4141 Vendome Place, New Orleans, LA  70125.

256.  Defendants'' violation of Article 863 has caused Defendants damages.

257.  As a result of Defendants'' violation of Article 863, Defendants are indebted unto

Counterclaimant for a sum not yet ascertained and which will be determined at trial.

## COUNT XII
## FAILURE TO GIVE MENNONITE NOTICE
### (Against BAC, Jackson McPherson and Jackson)

258.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

259.   BAC HOME LOAN SERVICING, LP sold the Property without giving Gerard the requisite Mennonite Notice.

260.  Gerard, as a party with an interest in the Property, was entitled to a Mennonite Notice.

261.   Under the laws and constitution of the United States, a person who has an ownership interest in property must be given notice before the property can be sold.

262.  BAC, knew or should have known about Gerard's interest in the Property with little due diligence and that such notice cannot be waived.

263.   In failing to exercise due care, failing to run a title search on the property and/or ignoring the property rights of Gerard, BAC is indebted unto Gerard for damages in sum still unascertained and will be determined at trial.

264. BAC HOME LOAN SERVICING, LP went forward with the sale of the Property, quietly transferring title of the property to itself, seeking to evict the resident in the property and proceeding to list the property with a realtor for without care or concern for any of the property rights of Gerard.

265.  Gerard acquired an interest in the Property as part of a Bond for Deed sale for good and valuable consideration in the amount of $330,000.00 in part to assist Flicher and Mendy.

266.  This Bond for Deed was recorded in the land records of the Parish of Orleans, State of Louisiana.

267. Without any notice to Gerard, BAC and its attorneys proceeded to sell the property via a Sheriff's Public Sale on or about July 1, 2010.

268.  On belief and information, BAC and its attorneys did this despite knowing that they had an obligation to provide the requisite Mennonite Notice.  As a result, BAC and its attorneys are responsible for all damages suffered by Gerard.

## COUNT XIII
## BREACH OF CONTRACT
### (Against BAC)

269.  The allegations of Paragraphs 1 through 268 are incorporated herein by reference as if same were fully pleaded herein.

270.  Part of the terms of the contract between Plaintiffs Flicher and Mendy and BAC is the provision that BAC would send Flicher and Mendy a detailed notice and demand providing loan information prior to any foreclosure action.  At the very the minimum, BAC should have provided the following information:

Outstanding Principle Balance owed;

Payment received in last billing cycle;

Monthly payment past due, including current and past portions;

Interest paid YTD; and

Interest outstanding up through the date of demand.

271.  BAC further breached its contract by failing to provide the requisite notice before undertaking the foreclosure.

272.  BAC further breached its contract by failing to provide other requisite notices.

273. BAC also breached its contract by failing to provide a payoff quote to Plaintiffs.

274.  Part of the agreement between BAC and Mendy is the provision that lender would

not sell or transfer the loan without notice to Mendy.

275.  BAC breached its agreement by transferring the loan to BAC without notice to Mendy.

276.  Part of the agreement between BAC and Mendy is the provision that BAC would comply with Louisiana and Federal Law.

277.  BAC breached its agreement by failing to pay comply with the requirements of law including but not limited to the following:

Violating the Louisiana Unfair Trade Practice Act (See Unfair Trade Practices Action);

Failing to provide notice;

Failing to comply with Louisiana law regarding the regulation of financial institutions as will be established at trial;

Failing to comply with Louisiana law regarding executory process;

Improperly taking advantage of the appointment of a curator in this matter.

278.  BAC's actions and inactions, constitute a breach of its contract with Plaintiffs as well as a violation of both federal and state law as will be shown at trial of this matter.

279.  Part of the agreement between BAC and Plaintiffs is the provision that BAC would comply with Louisiana and Federal Law.

280.  BAC breached its agreement by failing to pay comply with the requirements of law including but not limited to the following:

Violating the Federal Trade Commission Act (See Unfair Trade Practices Action);

Violating the Fair Debt Collection Practices Act (FDCPA) (See FDCPA Action);

Violating the Louisiana Unfair Trade Practice Act (See Unfair Trade Practices Action);

Failing to provide monthly billing or statements;

Failing to Appraise the Properties;

Failing to pay taxes timely;

Force-placing insurance;

Failing to account for payments made, interest and principle;

Failing to comply with HAMP;

Failing to apply ALL insurance proceeds to rebuild the property;

Failing to comply with MHAAP;

Failure to exercise due diligence in resolving problems with the Loan;

Failing to comply with Louisiana law regarding the regulation of financial institutions as will be established at trial;

Failing to follow all executory process procedures.

281.   On belief and information, Defendants'' actions herein are part of a pattern and practice of Defendants' strong-arming its customers to gain an unfair advantage and Defendants' normal way of doing business by unscrupulously breaching its agreements to its benefit and the detriment of its customers.

282.   BAC's actions and inactions, constitute a breach of its contract with Plaintiffs as well as a violation of both federal and state law as will be shown at trial of this matter.

283.   BAC's breach caused plaintiffs damages as a direct result of the breach.

284.   The damages caused by BAC's breach are not fully ascertainable but on belief and information is over $500,000.00.

285.   BAC's breach is a proximate cause of the damages incurred by MPLC.

286.   As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for an unspecified amount which has not yet been ascertain, an amount sufficient to compensate

Plaintiffs for all damages incurred as a result of BAC's breach of contract, damages that will be established at trial of this matter.

287.  As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for general damages, an unspecified amount which has not yet been ascertain, as well as any other damages as may be established at trial of this matter.

288.  As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for court costs, expense of litigation and attorney's fees as may be established at trial of this matter.

289.  As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for an unspecified amount which has not yet been ascertained, an amount sufficient to compensate Mendy for all actual damages incurred as a result of BAC's breach of contract, damages that will be established at trial of this matter.

290. As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for an unspecified amount which has not yet been ascertained, an amount sufficient to compensate Mendy for all consequential damages they incurred as a result of BAC's breach of contract as may be established at trial of this matter.

291. As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for an unspecified amount which has not yet been ascertained, an amount sufficient to compensate Mendy for general damages, as well as any other damages as may be established at trial of this matter.

292. As a result of BAC's breach of its contract, BAC is indebted unto Plaintiffs for an unspecified amount which has not yet been ascertained, an amount sufficient to compensate Mendy for court costs, expense of litigation and attorney's fees as may be established at trial of this matter.

## COUNT XIV
### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING
**(Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)**

293.  Plaintiffs adopt, allege and affirm all allegations and averments contained in the above and foregoing paragraphs of this Petition.

294.   Defendants BAC, its agents, and each of them, owe and owed a duty of good faith and fair dealing to Plaintiffs Mendy and Flicher pursuant to their contractual and ongoing business relationship with them.

295.  Defendants breached their duty of loyalty and duty of good faith and duty of dealing as described above.

296.  As a result of Defendants' conduct, Plaintiffs Mendy and Flicher suffered and continue to suffer general, special, actual and compensatory damages, in an amount to be proven at trial for all of which Defendants are jointly and severally liable.

## COUNT XV
### JUSTIFIABLE RELIANCE
**(Against BAC, Jackson McPherson and Jackson)**

297.   The allegation of paragraphs 1 through 296 are incorporated herein by reference and repleaded herein.

298.   From May 2008 and continuing to the sale of the Property by executory process, BAC, through its employees, represented to Mendy that BAC was interested in amicable resolution of the matter and that BAC would consider approving a loan modification or short sale of the property.

299.  Mendy relied on BAC's representations.

300.  Such reliance was reasonable given that BAC is a bank and a National Association.

301.  Mendy and each of the Plaintiffs relied on Defendant BAC's representations to their

detriment.   Specifically, Plaintiffs missed out on several opportunities to refinance or sell the Property in pursuit of the amicable resolution agreed to by the parties.

302.  Plaintiffs' reliance on BAC's promises was all to no avail.  BAC had no intention of honoring its promises.  Instead, while pretending to desire amicable resolution and to process the short sale and other workout requests of Mendy, BAC was surreptitiously proceeding with foreclosure of the Property, completely disregarded BAC's words and promises and simply acted with wanton disregard.

303.  If Mendy and Flicher were given notice and afforded an opportunity to be heard, Mendy and Flicher had numerous affirmative defenses that they would have raised had they been afforded an opportunity to so.  Some of the defenses Mendy and Flicher had and could have raised include, but not limed to, the ones herein.

304.  On belief and information, Plaintiff BAC HOME LOAN SERVICING, LP had no right of action in the executory process as BAC did not sufficiently pleaded its right of action or the legal chain through which it acquired one.

305.   Borrowers entered into a loan agreement with America's Mortgage Lender, not with BAC HOME LOAN SERVICING, LP.

306.   The mortgage documents and agreements were rife with issues as an audit of the documents show.

307. The obligation, which is the cause of this litigation, is a prime example of predatory lending practices that are the cause of the sub-prime mess.  Lender shackled borrowers with a loan and mortgage that borrowers could not afford and terms that were untenable—initially affordable ($2400) but later unaffordable ($3800).

308.   The loan and the process under which it was issued is a violation of Louisiana'

unfair Practices and Trade Act as will be show at trial.

309.  The unfair use of Executory Process is also a violation of law as will more fully shown at trial.

310.  If the loan was properly transferred to BAC HOME LOAN SERVICING, LP, this foreclosure would still be a violation of law and public policy as it would appear that BAC HOME LOAN SERVICING, LP acquired the loan for the sole purpose of foreclosing on the debtors.

311.  Despite incessant effort by debtors to resolve the outstanding payment issue, BAC HOME LOAN SERVICING, LP has not been forthcoming or cooperative.  Instead of acting in good faith in its dealings with Mendy and Flicher, BAC lulled Mendy and Flicher into thinking that it was working with them.

312. HOME FINANCE, LLC 's actions are taken despite it knowing fully well that it had an obligation and duty to Mendy and Flicher to explore options including abatement of interest and penalties, loan modification, deferment of payment and the like, remedies afforded by law and encourage by public policy in light of the subprime mortgage crisis.

313.  Charles Albert Mendy should not have been foreclosed on but for BAC HOME LOAN SERVICING, LP's predatory tactics, BAC HOME LOAN SERVICING, LP's misrepresentations, abuse of process and bad faith.  Until the date of the sale, BAC HOME LOAN SERVICING, LP represented to Charles Albert Mendy that it would not go forward with the scheduled sale and that same was stopped.

314.  Plaintiffs' reliance on BAC's promises has caused Plaintiffs significant damages, including, but not limited to, the damages outlined herein above in the Breach of Contract claim.

315.  BAC' breach of its promises is a proximate cause of the damages suffered by

Plaintiffs in reliance on BAC's promises.

316.  The damages were caused by BAC's promises and the Plaintiffs' justifiable reliance on same.

317.  The value of the damages caused by Plaintiffs' justifiable reliance on Defendants' promises is yet unascertainable and will be established at a trial of this matter or as the court may find appropriate.

318.  As a result of BAC's promises and Plaintiffs' justifiable reliance on same, BAC is indebted unto Plaintiffs Mendy and Flicher for an unspecified amount which has not yet been ascertain, an amount sufficient to make Plaintiffs whole for all losses suffered as a result of their reliance on BAC's, as well as any other damages as may be established at trial of this matter.

319.  BAC is also liable and indebted to Plaintiffs for reasonable attorney' fees, court costs and other reasonable expenses of litigation.

**COUNT XVI**
**UNFAIR TRADE PRACTICES UNDER LOUISIANA LAW**
**(Against Jackson McPherson, Jackson and Does 1 through Does 10)**

320.  The allegation of paragraphs 1 through 319 are incorporated herein be reference as if pleaded herein.

321.  BAC's attorneys' actions throughout its dealing with Plaintiffs constitute a pattern and practice of engaging in unfair trade practices and corrupt acts including but not limited to the actions complaint of in the Breach of Contract, and other claims herein.

322. Jackson's and Jackson McPherson's actions and inactions, constitute unfair and deceptive acts or practices in direct violation of the Louisiana Unfair Trade Practices and Consumer Protection Act (LUTPA).  Louisiana Unfair Trade Practices and Consumer Protection Act states that in pertinent part that " . . . unfair methods of competition and unfair or deceptive

acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La.R.S. 51:1405.

323.    Louisiana Unfair Trade Practices and Consumer Protection Act confers a right of action on any person who "suffers any ascertainable loss of money or movable property, corporeal or incorporeal," for actual damages resulting from unfair trade practices, in addition to court costs and attorney fees. La.R.S. 51:1409.

324.   All of the Plaintiffs, as result of the actions as pleaded above, have the standing to bring an action under LUPTA.

325.   Defendants' actions and inactions, further constitute unfair and deceptive acts or practices in direct violation of the Federal Trade Commission Act (FTCA).

326.   As a result of Defendants' actions, Plaintiffs have suffered numerous damages as outlined hereinabove.

327.    Defendants violated the LUPTA, and caused Gerard and the other Plaintiffs significant damages.  Consequently, Plaintiffs are entitled to treble damages (after certification by the Attorney General for the State of Louisiana)

328.  As a result of Defendants' actions, Plaintiffs are entitled not only to treble damages (and/or other damages as this Court finds appropriate) but also to court costs, expenses of litigation and attorney's fees as well.

## COUNT XVII
## NEGLIGENCE CLAIM
### (Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)

329.  The allegations of paragraphs 1 through 328 are incorporated herein by reference.

330.   Defendants, and each of them, owed a duty to Plaintiffs of good faith, fair dealing and fair business practices. Defendant BAC and Jackson McPherson should have disciplined or otherwise taken corrective action to stop further acts of their agents and employees.

331.   The failure of Defendants to take any action to stop the actions of other employees and agents of the Defendants constitutes negligence.

332.   The actions of Defendants and their failure to take any action to stop the actions of Defendants' employees' and agents' actions constitute negligence.

333.   Defendant BAC and Jackson McPherson owed a duty to Plaintiff Gerard to notice all property interest holders in the Property about the seizure of the property and its proposed sales date.  As a result, Defendant should have take all steps necessary and proper to give Gerard notice of the sale.

334.  Defendants' negligence has caused Plaintiffs damages, in an amount to be established at trial.

335.  Defendants are responsible for all damages due to their negligence.

**COUNT XVIII**
**FRAUD**
**(Against BAC, Jackson McPherson, Jackson and Does 1 through Does 10)**

336.  Plaintiffs hereby incorporate by reference all paragraphs of the General Allegations, and the allegations of all prior Causes of Action, as though fully set forth herein.

337.   Plaintiffs re-allege and incorporate by reference the allegations contained in ach preceding paragraph.

338.  Defendants' actions constitute fraud.

339.  As a result of Defendants' unlawful actions, Plaintiffs have been damaged in an amount to be proven at trial.

340. Defendants' acts were in bad faith, willful and in conscious or reckless disregard of Plaintiffs' rights.  As a result, Plaintiffs are entitled to punitive damages and attorneys' fees.

**COUNT XIX**
**ACCOUNTING**
**(Against BAC Only)**

341.  The allegation of paragraphs 1 through 340 are incorporated herein by reference and repleaded herein.

342.  Despite repeated demand from Flicher and Mendy, BAC has refused to provide Plaintiffs with an account statement documenting the starting loan balance as well as interim payments (installments or other payments) made to BAC by Plaintiffs and/or on behalf of Plaintiffs by others and advances for expenses and other expenditure made by BAC.

343.  Jackson has claimed that the loan amount was over $450,000.00 when asked to send Plaintiffs any excess funds due form the Sheriff's Sale.

344.  BAC has failed to provide an accounting.

345.  Plaintiffs have asked BAC on numerous occasions to account for all payments made, all to no avail.

346.  Plaintiffs further have asked BAC on numerous occasions to account for all payments made on behalf of Plaintiffs by unrelated third parties, including all insurance proceeds.  Again, all in vain.

347.  BAC has yet to be forthcoming on Plaintiffs'' request for total accounting of the payments made to it.

348.  Despite repeated requests BAC has refused to acknowledge or apply the money from the Civil Sheriff sale against the principle of the loan.  Further BAC has refused to account for the fees and commission, if any, it paid to the Civil Sheriff.

349.  An accounting is required in order for Plaintiffs to know how BAC accounted for all the payments it received as well as to establish how BAC used the funds from the Sheriff's sale.

350.  An accounting is required in order for Plaintiffs to know whether BAC and its attorneys improperly and knowingly placed a bid for more than the value of BAC's loan at the Sheriff's sale.

351.  Finally an accounting is needed to verify whether the amount BAC claims is currently owed by Plaintiffs (over $25,000.00) is actually owed.

## COUNT XX
## CONSPIRACY
### (Against ALL Defendants)

344. Plaintiffs hereby incorporate by reference all paragraphs of the General Allegations, and the allegations of all prior Causes of Action, as though fully set forth herein.

345. Plaintiffs re-allege and incorporate by reference the allegations contained in each preceding paragraph.

346. Defendants BAC, Jackson McPherson, Jackson and Does 1 through 10, by their actions outlined above, engaged in a conspiracy to violate Plaintiffs' rights, improperly foreclose on Plaintiffs Property and to defraud Plaintiffs.

348. As a result of Defendants' unlawful actions and conspiracy, Plaintiffs have been damaged in an amount to be proven at trial.

349. Defendants' acts were in bad faith, willful and in conscious or reckless disregard of Plaintiffs' rights.  As a result, Plaintiffs are entitled to punitive damages and attorneys' fees.

350.  As a direct and proximate result of the Defendants' Conspiracy alleged herein, Plaintiffs have sustained and will continue to sustain significant damages in a sum currently

unascertainable.

351.  As a result of their misconduct and Conspiracy herein, the Defendants are liable to Plaintiffs.

352. Neither the whole nor part of this sum has been paid, although demand therefore has been made before the filing of this Complaint and by this Complaint.

353.  Consequently, there is now due and owing, and unpaid, a sum in an amount not yet ascertained, with interest judicial interest thereon as set by law.

**COUNT XXI**
**DECEIT**
**(Against ALL Defendants)**

354. Plaintiffs hereby incorporate by reference all paragraphs of the General Allegations, and the allegations of all prior Causes of Action, as though fully set forth herein.

355. Plaintiffs re-allege and incorporate by reference the allegations contained in each preceding paragraph.

356.  Defendants actions constitute Deceit.

357. As a result of Defendants' unlawful actions and Deceit, Plaintiffs have been damaged in an amount to be proven at trial.

358. Defendants' acts were in bad faith, willful and in conscious or reckless disregard of Plaintiffs' rights.  As a result, Plaintiffs are entitled to punitive damages and attorneys' fees.

359.  As a direct and proximate result of the Defendants' Deceit alleged herein, Plaintiffs have sustained and will continue to sustain significant damages in a sum currently unascertainable.

360.  As a result of the misconduct and Deceit alleged herein, the Defendants are liable to Plaintiffs.

361. Neither the whole nor part of this sum has been paid, although demand therefore has been made before the filing of this Complaint and by this Complaint.

362. Consequently, there is now due and owing, and unpaid, a sum in an amount not yet ascertained, with interest judicial interest thereon as set by law.

### CONSEQUENTIAL DAMAGES

363. The allegation of paragraphs 1 through 362 are incorporated herein by reference and repleaded herein.

364. In refusing to honor its contractual obligations, BAC acted callously and with wanton disregard of Mendy and Flicher's contractual rights.

365. In ignoring Defendants' pleas amicable resolution, BAC further acted callously and with wanton disregard of Defendants' rights.

366. In selling the Property, BAC knew or should have known about the property interest of Gerard and that BAC was required by law to give a Mennonite Notice yet proceeded without due care. As a result, the sale of the Property is another act of callous and wanton disregard of Louisiana Law and Defendant Gerard's rights.

367. As a result of BAC' actions, BAC has exhibited the kind of wanton disregard and bad faith that mandates consequential damage damages.

368. In representing BAC in the Executory Process proceeding, the sale of the property without proper notice, the improper hiring of a curator and selling the Property without following the requirements of the Louisiana's executory process law, Defendants also acted recklessly, callously and with wanton disregard of Louisiana Law and Defendants' rights.

369. As a result of their actions, Defendants have caused undue hardship and damages to Gerard, Mendy and Flicher.

370.  As a result of BAC's and its attorneys' callous acts and wanton disregard, Mendy, Flicher and Gerard are entitled to all damages caused by their action, whether or not foreseeable, as well as any other appropriate damages for their causes of action.

## PUNITIVE DAMAGES

371.  The allegation of paragraphs 1 through 370 are incorporated herein be reference and repleaded herein.

372.  In refusing to honor its contractual obligations, BAC acted callously and with wanton disregard of Plaintiffs' contractual rights.

373.  In ignoring Plaintiffs' pleas regarding providing an accounting of all payments made to BAC and all payment made by and/or received on behalf of Plaintiffs, further acted callously and with wanton disregard of Plaintiffs contractual rights.

374.  In ignoring Plaintiffs' pleas regarding providing an accounting of all payments made by BAC and all expenses and cost charged by BAC to Plaintiffs, further acted callously and with wanton disregard of Plaintiffs contractual rights.

375.  The callous acts of BAC and DJR include but are not limited to the following:

(a) Failing to send monthly billing;

(b) Failing to provide a reinstatement amount.

(c) Failing to provide a payoff to enable Plaintiffs to sell or refinance the Properties.

376.  As a result of BAC's actions, BAC has exhibited the kind of wanton disregard that mandates punitive damages.

377.  As a result of its actions, BAC had caused undue hardship to Plaintiffs and made them lose their Property.

378.  As a result of Defendants' callous acts and wanton disregard, Plaintiffs is entitled to

punitive damages as well as any appropriate breach of contract damages.

## ATTORNEY FEES AND COURT COSTS

379.  The contract between BAC and Plaintiffs provides for attorneys' fees and court costs.

380.  Further, Plaintiffs are entitled to Attorney's fees and court cost as a result of their justifiable reliance on BAC's promises, their various federal actions, Article 863 Action, LUTPA Claims and Punitive Damages action.

381.  Consequently, Plaintiffs are entitled to attorney's fees and court costs.

## INJUNCTIVE RELIEF

381.  The allegation of paragraphs 1 through 380 are incorporated herein by reference and repleaded herein.

382.  Mendy is entitled to and prays for a preliminary injunction enjoining BAC from disposing of the property without further order of this court.

383.  Disposition of the property would cause irreparable harm to Mendy due to the sentimental nature of his ownership of the property as it use as his residence and the residence of Gerard.

384.  Notice of Mendy's request for injunctive relief was sent to attorney for BAC before the filing of this Request for Injunctive Relief and will also be sent by service of the Rule to Show Cause setting a Preliminary Injunction for hearing.

385.  Any harm to BAC would be minimal.  As a result, a bond is not required herein.

## INJUNCTIVE RELIEF

386. Plaintiffs demand a trial by jury on all issues so triable.

WHEREFORE, petitioners pray that Defendants be served with a copy of this petition

and be duly cited to appear and answer same, and that after due proceeds had, there be judgment herein in favor of Plaintiffs, Dominique Flicher, Charles Albert Mendy and Cheryl Ann Gerard Mendy, and against Defendants, BAC, Jackson McPherson, Jackson, Does 1 through Does 10, ABC Insurance and XYZ Insurance, for damages that are reasonable in the premises, together with interest thereon from the date of judicial demand until paid, and for all costs of these proceedings.

PETITIONERS ALSO PRAY for the following relief form this court:

A.    Enter a judgment declaring the acts and practices of Bank of America complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer a loan modification Mendy and Flicher;

B.    Enter a judgment declaring the acts and practices of Bank of America complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer a short sale to Mendy and Flicher;

C.    Grant a permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs;

D.    Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.    Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under MHAAP;

F.    Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

G.    Preliminarily enjoin Bank of America from disposing of the property located at 4141 Vendome Place, New Orleans, Louisiana pending trial on the merits or other order of this court;

H.    Award actual and statutory damages to the Plaintiffs in amounts to be proven at trial;

I.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

J.    Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

PETITIONERS ADDITIONALLY PRAY that this court enjoin the Defendants from conducting any further improper activity, including, but not limited to violation of HAMP, MHAAP, the FDCPA and other laws, with regarding petitioners and others.

PETITIONERS ALSO PRAY for all attorney's fees and court costs that can be afforded them under their agreement with BAC, from the causes of action herein, and under the laws of the State of Louisiana and of the United States.

PETITIONERS FURTHER PRAY for all general and equitable relief that can be afforded them under the laws of the State of Louisiana and Federal law.

PETITIONERS FINALLY PRAY judicial interest from the date of demand.

Respectfully Submitted

MENDY & BEEKMAN, PLLC

/s/  Edward B. Mendy

EDWARD B. MENDY, LA Bar No.:  22117
One Liberty Center, Suite 3600
Philadelphia, PA 19103
267-675-7100 * 215-701-9547 (f)

Attorneys for Plaintiffs


_____
JOHN D. CONRY, LA Bar No.:  #29807
1100 Clearview Parkway
Metairie, LA 70001
(504) 324-6609 * Fax: (504) 754-7556

Attorneys for Plaintiffs